UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEITH SPEER,

    Plaintiff,

v.

    Case No. 08-cv-13526

    Honorable Patrick J. Duggan

CITY OF FLINT,

    Defendant.

_____/

## OPINION AND ORDER

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on_December 29, 2010.

PRESENT:    THE HONORABLE PATRICK J. DUGGAN
                   U.S. DISTRICT COURT JUDGE

Keith Speer ("Plaintiff") filed this action against the City of Flint ("Defendant"), alleging violation of his freedom of speech under the First Amendment to the United States Constitution and retaliation in violation of Michigan's Elliott-Larsen Civil Rights Act, Michigan Compiled Laws § 37.2101 *et seq.* Presently before the Court is Defendant's Motion for Summary Judgment, filed pursuant to Federal Rule of Civil Procedure 56. The matter has been fully briefed, and the Court heard oral arguments on November 30, 2010. For the reasons stated below, the Court grants Defendant's Motion in part and denies it in part.

**I. Factual and Procedural Background**

At all times relevant, Plaintiff was employed as a police officer by Defendant. Compl. ¶ 4. Plaintiff was also the President of the Flint Police Officers' Association ("FPOA"), the union representing Defendant's police officers. *Id.* ¶ 5.

In June 2008, Donald Williamson, the Mayor of Flint, appointed David Dicks to the position of acting police chief. Pl.'s Br. 2. The appointment was controversial because Dicks, a former Flint police officer, lacked supervisory experience and had been terminated from the police force after pleading guilty to a charge of impaired driving. *Id.* Dicks was also under investigation by the FBI at the time. *Id.* at 3.

On June 9, 2008, Dicks distributed a Memorandum with the subject "Release of Information," stating:

> No member of the department shall speak to or release any information regarding the department and/or its employees to the news media. This is in accordance with the Flint Police Department's Rules and Regulations #5/002.2-1 - Responsibility for the Release of Information.

Pl.'s Br. Ex. H. Prior Flint Police Department policy allowed officers to speak to the media, but required them to clarify that such statements reflected their own opinions, rather than the opinion or policy of the Flint Police Department. Pl.'s Br. 3.

Plaintiff often spoke to the media on behalf of the FPOA. On July 2, 2008, Dicks observed Plaintiff giving a television interview. *Id.* at 1. Because neither Dicks nor Public Information Officer Kenneth Engel had authorized the interview, Dicks contacted Sergeant Charles Mitchell to file an incident report.[1] *Id.* On July 10, 2008, Dicks

---

[1] In the Flint Police Department, an incident report is the first step in an internal investigation.

contacted Mitchell regarding an article published in the *Flint Journal*, a local newspaper, in which Plaintiff stated that he was under investigation for speaking with the media. *Id.* In another *Journal* article, published on July 11, 2008, Plaintiff described the administration's propensity for disciplining officers who spoke to the press by saying, "[i]t's almost like a dictatorship." Pl.'s Br. Ex. M at 13. On July 17, 2008, as a result of Mitchell's investigation, Plaintiff was suspended from duty for five days. Pl.'s Br. 1. Plaintiff filed a grievance challenging his suspension. *Id.* at 4.

Plaintiff filed this action on August 14, 2008, asserting violations of his free speech rights under the First Amendment and violations of Michigan's Elliott-Larsen Civil Rights Act. Plaintiff sought damages and an order declaring Defendant's policy unconstitutional.

On September 8, 2008, Dicks issued a Memorandum rescinding the June 9, 2008 Memorandum. Plaintiff's suspension was also rescinded. Plaintiff claims that in response to his suspension, he curtailed his interaction with the media. *Id.* at 5. A faction of the FPOA proposed representation by the Teamsters union, seeking a stronger public voice for members' concerns. *Id.* This proposal was eventually defeated in an election held by FPOA members. *Id.*

On August 10, 2010, Defendant filed a Motion for Summary Judgment, arguing that Plaintiff's action should be dismissed because (1) he cannot identify the speech resulting in action against him, (2) his speech was not constitutionally protected, and (3) his alleged injury was not caused by a municipal custom or policy.

## II. Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any

material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323, 106 S. Ct. at 2553.

Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512. The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *Id.* at 255, 106 S. Ct. at 2513. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *Id.*, 106 S. Ct. at 2514.

### III. Governing Law

"While public employees may not be required to sacrifice their First Amendment

free speech rights in order to obtain or continue their employment, a state is afforded greater leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions." *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003). Courts apply a three-step inquiry to public employees' First Amendment retaliation claims.

First, the Court must determine whether the speech addressed a matter of public concern. *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 143, 103 S. Ct. 1684, 1688 (1983)). This is a question of law for the Court to resolve, although there may be some factual questions for a jury if it is disputed whether the expression occurred or what words were specifically stated. *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 180 (6th Cir. 2008). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48, 103 S. Ct. at 1690. A public employee speaking pursuant to his official responsibilities is not speaking as a citizen, and his speech is therefore not constitutionally protected. *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S. Ct. 1951, 1960 (2006).

If the speech addressed a matter of public concern, the Court must "balance the interests of the public employee, 'as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Rodgers*, 344 F.3d at 596 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734-35 (1968)). The application of the *Pickering* balancing test is a matter of law for the Court to decide. *Hughes*, 542 F.3d at 181.

5

"Finally, the court must determine whether the employee's speech was a substantial or motivating factor in the employer's decision to take the adverse employment action against the employee." *Id.* "[T]he employee must 'point to specific, nonconclusory allegations reasonably linking her speech to employer discipline.'" *Rodgers*, 344 F.3d at 602 (quoting *Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 602 (6th Cir. 2002)).

## IV. Application to Plaintiff's First Amendment Retaliation Claim

### A. Matter of Public Concern

As long as some portion of the employee's speech addresses a matter of public concern, it is protected. *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004). "Speech is of 'public concern' if it involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Id.* at 590. "When an institution oversees some aspect of public safety, the correct operation of that institution is a matter of public concern." *Hoover v. Radabaugh*, 307 F.3d 460, 466 (6th Cir. 2002). Matters of interest only to employees, such as personal vendettas, do not enjoy First Amendment protection. *McMurphy v. City of Flushing*, 802 F.2d 191, 197-98 (6th Cir. 1986).

Defendant's Investigative Report Synopsis states that Plaintiff was disciplined in response to his comments in a July 2, 2008 televison interview and in the *Flint Journal*. Pl.'s Br. Ex. C. Defendant contends that the only speech that could have precipitated the suspension was a comment in the July 11, 2008 *Flint Journal*, stating that Defendant's use of its media policy was "almost like a dictatorship." Def.'s Br. Supp. Mot. 7. The Court concludes that even this comment involved a matter of public concern. In the relevant

*Journal* article, Plaintiff said that he was investigated for speaking with the media about police layoffs. Pl.'s Br. Ex. M at 13. Plaintiff's statement clearly referred to the use of Defendant's media policy to silence union criticism of the Flint Police Department. Public employees, however, "are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public." *City of San Diego v. Roe*, 543 U.S. 77, 82, 125 S. Ct. 521, 525 (2004). Police officers can be expected to raise concerns about the police department's operation through their union, and Plaintiff alleged that Defendant's policy prevented such criticism. Flint residents have a strong interest in the correct operation of the Flint Police Department because of its central role in maintaining public safety. They therefore have an interest in Defendant's attempts to silence the police union. The Court concludes that Plaintiff's comments involved a matter of public concern.

Defendant cites *Farhat v. Jopke* in support of its position, but this reliance is misplaced. In that case, the plaintiff resorted to a variety of personal attacks, referring to others as "ignorant," "insane," "mentally ill," and "sick and demented." *Farhat*, 370 F.3d at 584-85. The only allegations of impropriety involved the defendant's failure to address the plaintiff's grievances adequately. *Id.* at 586. This is distinguishable from Plaintiff's criticism, which alleged that Defendant used its media policy to silence all dissent.

Defendant also cites *McMurphy v. City of Flushing*, but this decision provides little support for its argument. In that case, the plaintiff accused city officials of unspecified cover-ups and misconduct, used "strong and vulgar language," and even attempted to incite a physical altercation with the city manager. *McMurphy*, 802 F.2d at 193. The

7

court found that the plaintiff's remarks and actions indicated a personal vendetta. Plaintiff's comments here certainly paint a negative picture of Defendant's decisions, but fail to demonstrate the same sort of personal animosity.

Defendant points to *Brown v. City of Trenton*, but the comparison is inappropriate. In *Brown*, the plaintiff police officers wrote a letter to the police chief, stating that they were "fed up with . . . the internal strife from within our own department," and citing a number of factors contributing to that conflict. 867 F.2d 318, 319 (6th Cir. 1989). These included jealousy, internal politics, and allegations that the city's Emergency Response Tactical Team had become a scapegoat for the financial and union problems. *Id.* at 319-20. As the letter admittedly focused on "internal strife," it could only be construed as focusing on issues of personal interest to city employees. Plaintiff's comments in this case are distinguishable, as he spoke to the media regarding Defendant's use of its media policy to silence criticism. The issue is particularly relevant to outsiders, as they would be most affected by Defendant's decision to restrict statements to the media.

**B. Statements Made Pursuant to an Employee's Official Duties**

In *Garcetti v. Ceballos*, the Supreme Court was faced with the question of whether a public employee could be disciplined for statements made in his official capacity. 547 U.S. at 414-15, 126 S. Ct. at 1955-56. The Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S. Ct. at 1960. The Court noted that this result comported with the policies underlying First Amendment jurisprudence:

> Employers have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission.

*Id.* at 422-23, 126 S. Ct. at 1960. The Court noted that there was no dispute as to whether the employee made his statements pursuant to his official duties. *Id.* at 424-25, 126 S. Ct. at 1961. The Court therefore did not articulate "a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Id. Garcetti* merely cautioned that when addressing such scenarios, "[t]he proper inquiry is a practical one." *Id.*

Courts applying this "practical" inquiry after *Garcetti* have faced the more difficult question of whether the First Amendment protects statements by public employees acting pursuant to their duties as union officials. The Seventh Circuit addressed this issue in *Fuerst v. Clarke*, 454 F.3d 770 (7th Cir. 2006). In *Fuerst*, the plaintiff deputy sheriff was also president of the union of Milwaukee County deputy sheriffs. *Id.* at 771. He criticized the sheriff's decision to replace a deputy with a civilian in a civil service position. *Id.* at 772. After this criticism was reported in Milwaukee's leading newspaper, the plaintiff was passed over for a promotion, allegedly because he was not "loyal" to the sheriff's "vision." *Id.* The court found *Garcetti* inapplicable because of the plaintiff's dual roles:

> Because Fuerst's comments that precipitated the adverse action taken against him were made in his capacity as a union representative, rather than in the course of his employment as a deputy sheriff - his duties as deputy sheriff did not include commenting on the sheriff's decision to hire a public-relations officer - the Supreme Court's recent decision in *Garcetti v. Ceballos* is inapposite.

9

*Id.* at 774 (citation omitted). The court concluded that when the employee was "wearing his union president's hat, he is not challenging the sheriff's authority but carrying out duties consistent with that authority." *Id.* at 775.

The Sixth Circuit recently addressed this scenario in an unpublished opinion, *Miller v. City of Canton*, 319 Fed. Appx. 411 (6th Cir. 2009). In that case, the plaintiff police officer also served as president of the local police officers' union, the Canton Police Patrolman's Association. *Id.* at 412-13. The plaintiff and the union issued a press release alleging that the police chief discriminated against black police officers, citing various department practices in support of this claim. *Id.* at 413. The plaintiff was suspended for sixty days for preparing and issuing this press release. *Id.* He filed suit, alleging that the city retaliated against him for participation in a protected activity. The district court granted summary judgment for the employer, and the plaintiff appealed. On review, the Sixth Circuit panel briefly addressed the application of *Garcetti* to the case, concluding that the plaintiff "was not doing what he was 'employed to do' when he issued the press release . . . [r]ather, the press release fell outside [Plaintiff's] official duties as a police officer." *Id.* at 417 (citations omitted). Drawing this distinction between a union official's duties to his employer and his duties to the union, the panel reversed the district court's grant of summary judgment as to the plaintiff's First Amendment claim. *Id.* at 419.

Neither *Miller* nor *Fuerst* is binding precedent, but the reasoning of these decisions is persuasive. The Court concludes that the City's interest in "controlling speech" and ensuring "substantive consistency," *see Garcetti*, 547 U.S. at 422-23, 126 S. Ct. at 1960, is considerably reduced in connection with the speech of a union official, due to the inherent

10

tension between the union and the administration.  The collective bargaining system envisions a dynamic between employer and union than is unlike the relationship between employer and employee; this includes the expression of sometimes conflicting opinions.  An employer cannot expect to control the union's speech in the same way it would control an employee's.  The Court concludes that where Plaintiff spoke in his capacity as FPOA president, *Garcetti* does not bar his First Amendment claim.

Although Plaintiff has spoken to the media on hundreds of occasions, the evidence establishes that he did so in his capacity as FPOA president.  Plaintiff testified that for twenty-three years, the FPOA president has always been the union's chief spokesman.  Pl.'s Br. Ex. D at 27.  Several of the published newspaper articles specifically identify Plaintiff as president of the FPOA.  *See* Pl.'s Br. Ex. M.  Defendant also admits that Plaintiff spoke in his capacity as FPOA president when he made the comments at issue.  Def.'s Br. Supp. Mot. 8.  *Garcetti* does not bar Plaintiff's First Amendment claim.

Defendant argues that *Nixon v. City of Houston*, 511 F.3d 494, 498 (5th Cir. 2007), bars Plaintiff's First Amendment claim.  In that case, the plaintiff police officer drove to the scene of an accident and made statements to the media.  *Id.* at 496.  The court found that these statements were not protected by the First Amendment, as the plaintiff made them while on duty and working at the scene of an accident.  *Id.* at 498.  Unlike the instant case, the plaintiff was not a union representative and there was no indication that he spoke in a capacity other than that of a police officer.  Plaintiff indisputably made his comments to the media in his capacity as FPOA president rather than as a police officer, undermining any comparison to *Nixon*.

**C. *Pickering* Balancing**

If a public employee's speech addressed a matter of public concern, the Court must "balance the interests of the public employee, 'as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Rodgers*, 344 F.3d at 596 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734-35 (1968)). In weighing these interests, the Court should consider whether an employee's comments meaningfully interfere with the performance of his duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Rodgers*, 344 F.3d at 601. "Relevant factors in this regard include 'the manner, time, and place of the employee's expression,' as well as 'the context in which the dispute arose.'" *Id.* (quoting *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S. Ct. 2891, 2899 (1987)). Defendant bears the burden of demonstrating that legitimate grounds existed for the adverse action. *Id.*

Considering these factors, the Court concludes that the *Pickering* balancing weighs in Plaintiff's favor. Defendant has presented no evidence that Plaintiff's comments interfered with the performance of his duties. Defendant has also failed to demonstrate that Plaintiff's speech resulted in disharmony among his coworkers. Plaintiff testified that "a lot of the officers on the police force" shared his views, and Defendant has not challenged this assertion. Pl.'s Br. Ex. D at 30. The only disharmony that Defendant has established is between Plaintiff and the City of Flint's leaders. Given the actions taken

just prior to Plaintiff's discipline, such as closing the jail and laying off police officers, some discord between the police officers' union and the administration could be expected. There is no evidence that Plaintiff's speech undermined the Flint Police Department's legitimate goals. The Court concludes that the FPOA's interest in raising concerns regarding the operation of the Flint Police Department is greater than Defendant's general interest in maintaining police discipline.

Defendant cites case law holding that a city's interest in maintaining a disciplined police force outweighs officers' free speech interests, pointing to *Brown v. City of Trenton* in support of its position. This reliance is misplaced, as the *Brown* court concluded that the plaintiffs' speech did not involve a matter of public concern, making the balancing of interests unnecessary. *Brown*, 867 F.2d at 322. Defendant also cites *Graham v. City of Mentor*, an unpublished Sixth Circuit decision, but the case is distinguishable. In *Graham*, three plaintiff police officers used the media to repeatedly voice their disapproval of the police chief. 118 Fed. Appx. 27, 28 (6th Cir. 2004). They allegedly conducted interviews with the press, harassed a local bar owner to support the police union, and forced a security guard to send a letter critical of the police chief to the newspaper. *Id.* at 29. The district court granted summary judgment for the employer, and the Sixth Circuit affirmed, holding that "a police chief cannot be expected to 'tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships.'" *Id.* at 30 (quoting *Connick*, 461 U.S. at 154, 103 S. Ct. at 1694). The court found that the plaintiffs "clearly intended to create division among the officers," noting that "[a] police chief needs authority over and loyalty from his subordinates." *Id.* at

13

30-31. There is no indication, however, that Defendant exercises authority over Plaintiff when he speaks as president of the FPOA. Plaintiff's statements on behalf of the FPOA do not undermine the authority of the police chief. Although the union's views may conflict with Defendant's, this does not constitute insubordination. Defendant notes that the officers in *Graham* were "active in the police union," but there is no indication that they were authorized to speak on the union's behalf. This difference cannot be ignored, as it is undisputed that Plaintiff was authorized to speak on behalf of the FPOA.

**D. Motivating Factor**

Defendant argues that Plaintiff's claim fails because he cannot identify the precise statements resulting in adverse action against him, citing *Rodgers v. Banks* for this proposition. The language Defendant cites, however, requires only that the employee demonstrate his speech was a "substantial or motivating factor" in the adverse employment action. *Banks*, 344 F.3d at 602. At the hearing, Defendant's counsel conceded that speech was the reason for Plaintiff's discipline. Defendant's Incident Report and its Investigative Report Synopsis establish a causal link between Plaintiff's speech and his suspension, specifically citing both Plaintiff's television interview and a *Flint Journal* newspaper article as violations resulting in discipline. *See* Def.'s Br. Supp. Mot. Exs. B, C. Plaintiff's speaking to the media was certainly a substantial factor in his discipline.

**E. Official Policy or Custom**

Defendant argues that Plaintiff's alleged injury was not caused by a municipal custom or policy, noting that municipalities cannot be held liable under a theory of

*respondeat superior* for the torts of their employees. Municipal liability attaches when the action that inflicts the injury represents official policy. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-38 (1978). Where an individual seeks to hold a municipality liable for a constitutional violation, "[a] court's task is to 'identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.'" *McMillian v. Monroe Cnty.*, 520 U.S. 781, 784-85, 117 S. Ct. 1734, 1736 (1997). "Officials can derive their authority to make final policy from customs or legislative enactments, or such authority can be delegated to them by other officials who have final policymaking authority." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993). The Court must identify the officials who have the power to make policy on a particular issue; the inquiry is not an "all or nothing" matter. *Id.* at 785, 117 S. Ct. at 1737.

Plaintiff argues that Defendant's policy unconstitutionally prohibited police officers from speaking about matters of public concern. Compl. ¶ 12. He further asserts that Defendant violated his First Amendment rights by disciplining him after he spoke to the media about matters of public concern. *Id.* ¶ 14. Plaintiff has set forth evidence showing that these actions originated from officials with final policymaking authority. Dicks issued the media policy in a Memorandum dated June 9, 2008. Pl.'s Br. Ex. H. Plaintiff presented testimony stating that department heads held ultimate authority for setting policy within their departments. Pl.'s Br. Ex. J at 47. He has also presented evidence showing that Mayor Donald Williamson directed Dicks to issue this policy, and that this was

15

Defendant's accepted practice. *Id.* at 46-47. With respect to disciplinary decisions, Dicks testified that he followed Williamson's orders. Pl.'s Br. Ex. E at 112. Drawing all justifiable inferences in Plaintiff's favor, the Court concludes that Plaintiff has established a genuine dispute of material fact regarding whether officials with final policymaking authority took the actions in question.

### V. Plaintiff's Claim Under the Elliott-Larsen Civil Rights Act

Count II of the Complaint asserts a claim under Michigan's Elliott-Larsen Civil Rights Act, Michigan Compiled Laws § 37.2101 *et seq.* Plaintiff's attorney has conceded this claim, and the Court therefore grants summary judgment for Defendant on Count II.

### VI. Conclusion

For the reasons stated above,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment is **DENIED** as to Count I of Plaintiff's Complaint, "Violation of Free Speech Rights";

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED** as to Count II, "Violation of Elliott-Larsen Civil Rights Act."

                                    s/PATRICK J. DUGGAN
                                    UNITED STATES DISTRICT JUDGE

Copies to:

Kelly A. Kruse, Esq.
John A. Postulka, Esq.